NELSON KUTCH, APPELLEE, V. ANNA KUTCH, APPELLANT.

FILED DECEMBER 23, 1909.   No. 15,802.

1. **Marriage:** ANNULMENT: BURDEN OF PROOF. In an action brought
to annul a marriage on the ground of fraud, the burden is on
plaintiff to establish the fraud relied upon by him to effect the
annulment.

2. ———: ———: EVIDENCE. The evidence examined and discussed
in the opinion *held* insufficient to sustain the judgment of an-
nulment of the marriage.

APPEAL from the district court for Hamilton county:
BENJAMIN F. GOOD, JUDGE. *Reversed.*

*O. A. Abbott* and *J. H. Edmondson,* for appellant.

*Charles P. Craft* and *J. H. Grosvenor, contra.*

DEAN, J.

Nelson Kutch, plaintiff and appellee, who is hereinafter
called plaintiff, was married to Anna Kutch, the defend-
ant, at Seward, Nebraska, on October 16, 1907. The
plaintiff commenced this action on January 23, 1908, to
annul the marriage, and recovered judgment, from which
the defendant appeals.

The petition, in substance, alleges that plaintiff and
defendant are 81 and 33 years of age, respectively; that
plaintiff· is the owner of real and personal property of the
value of $6,000; that his physical and mental condition is
greatly impaired by reason of age, and that defendant
wrongfully conspired with her mother, Caroline Newman,
in the summer of 1907, to bring about the marriage of
plaintiff and defendant to the end that defendant might
become the owner of his property; that false representa-
tions ·were made by defendant and Mrs. Newman to
plaintiff with respect to alleged unkind expressions that
were made concerning him by his children and relatives
to the effect that they desired his death that they might

inherit his property; that defendant informed him that, if she remained unmarried and took care of her mother during her lifetime, the latter would give to her the house and lot, of the value of about $2,000, where the two ladies lived alone in Aurora, but that, if she married, she would only share equally with other heirs in her mother's estate; that she thus prevailed upon plaintiff to make a deed to her of a house and lot in Aurora of the value of about $2,000 and to give to her $307 in cash, in consideration whereof, and as a recompense to reimburse her for the property she would otherwise have received from her mother if she remained unmarried, she agreed to marry plaintiff; that he believed and relied upon the representations made to him by defendant; that she at all times refused to live with plaintiff or to consummate the marriage, and at the time of the marriage was and now is physically incapable.

The defendant's answer denies generally all of the material allegations of the petition, but admits the marriage and the receipt of about $300 from plaintiff. As a reason for refusing to assume marital relations with her husband immediately after the marriage, she alleges, in substance, that some of his relatives, two days previous to the marriage, commenced an action in Hamilton county for the appointment of a guardian for plaintiff, and that, upon the advice of counsel and of friends, it was deemed imprudent for her to assume such relations with him until the determination of the guardianship proceedings. She pleads as a reason for her refusal to consummate the marriage immediately upon the preparation of their new home that it was owing to her over exertion in preparing the home for occupancy before moving therein, and that she thereby became tired, worn out and suddenly ill, and for that reason alone declined to accede to his request during such illness. She alleges plaintiff has abandoned the home furnished and prepared by the parties hereto, and that he has since refused to occupy the home and live with her therein, or to furnish her with means of sup-

port. She charges on information and belief that the pending suit was commenced and is maintained by one M. D. James, a son-in-law of plaintiff, who has conspired with other relatives of plaintiff to have him leave their home and remain separate and apart from her.

The plaintiff's reply is in the usual form, and denies all allegations of new matter in the answer.

The record herein is voluminous, and the case has been ably presented and argued on both sides. Upon examination of the pleadings and the testimony and the law applicable thereto, we conclude the contention of the learned counsel for plaintiff cannot be sustained. The proofs show, in substance, that plaintiff and defendant were married at Seward on October 16, 1907, and that plaintiff's first wife died about two years before that time. The defendant was a single woman, living with her widowed mother upon property owned by the latter in the same block and adjacent to residence property owned by plaintiff. After the death of his first wife plaintiff made his home with a married daughter in Aurora some distance away from the residence of defendant. The care of his property required his frequent presence on the premises, and its proximity to the residence of defendant and her mother, Mrs. Newman, naturally brought the parties together, and, as the record discloses, on terms of social equality. The testimony of the old gentleman shows that he began calling on the defendant at the Newman home in June, 1907, and that his visits were sufficiently frequent and extended to indicate that he entertained an unusual regard for her, and that he kept company with her from four to six weeks before the subject of marriage was discussed between them. He testifies that both defendant and her mother advised him that, if he would marry, it might prolong his life 15 or 20 years, and that Mrs. Newman assured him that Anna would be a suitable wife. He says that, when he proposed marriage, defendant told him she was not then at liberty to decide because her mother had promised to give to her the house

and lot where they lived and $2,000 if she would remain. unmarried and live with her until the old lady died, and that, if she married plaintiff, he would have to give her as good a house and lot as her mother's property which she would lose because of the marriage, and that the only reason she was requiring this of plaintiff was that she might have a home if he died before her. The plaintiff testifies he had some misgivings about his ability to support her, and that he told her so, but that after they had together taken an invoice of his property it was found to be ample to warrant their venture into the domain of matrimony. He testifies he had an agreement and property settlement with defendant, and that he gave a deed to her of town property worth about $2,000, in considera- of marriage, but refused to accede to other requests made by her upon his bounty. When he asked defendant if she demanded that a deed for the house and lot be executed by him before the marriage, she answered in the affirma- tive, and the next day he executed the deed, and a few days thereafter under his direction it was recorded. He went before the county judge in Aurora in the forenoon of October 14 to procure a marriage license, and the judge refused to issue it. Elsewhere in the record that official testifies that he had been informed by a relative of plaintiff in the morning, just before plaintiff's arrival, that guardianship proceedings were about to be instituted against him. Failing to secure the marriage license plain- tiff returned to the Newman home, and informed defend- ant and her mother of the situation, when the suggestion was made that plaintiff and defendant go to a neighbor- ing town, procure the license, and be married there. They then went to Seward, where the license was obtained and the marriage ceremony performed. Before starting to Seward plaintiff gave to defendant $307 and asked her to take care of it for them. After the marriage they re- turned to her mother's home, and Anna told plaintiff, he testifies, that she did not believe they ought to live to-

48

gether until after the guardianship proceedings concerning him were settled, which his children had commenced in the county court, whereupon he returned to his daughter's home. He testifies that upon one pretext and another defendant has always refused to live with him as his wife or to consummate the marriage relation. Plaintiff admits on cross-examination that he went to their home on one occasion not very long after the marriage, and finding defendant alone requested her to step into another room to procure for him an article of wearing apparel, and that, when she started to enter the room, his son-in-law and several other men came into the house and began taking up the carpets preparatory to removing them and the furniture therefrom. He admits that he said nothing to his wife on that occasion about living with him, but that "he had proposed to her once, and it was her turn."

The defendant testified that she never sought the company of plaintiff, but that he continually sought her out. She denies that her mother ever said anything in her presence to plaintiff upon the subject of marriage or with respect to any of the arrangments which preceded that event. She says she told him, when he asked her to marry him, that she thought it would be foolish to give up the certainty of her present home with her mother without an assurance that she would have a home in case she married plaintiff and survived him. She testifies that he commended her prudence in this respect, and without solicitation offered to give her the choice of two residence properties that he owned, and that she selected property that was adjacent to her mother's residence, and that plaintiff told her that he ought to give to her more property, and that she refused to accept it. She denies that she ever requested $2,000 of plaintiff, or any other sum of money. She testifies that for about a week before they were married plaintiff importuned her daily to permit him to procure a license and wed her at once, and that, after the writ in the guardianship proceeding was

served on plaintiff, he said: "We will have to go ahead and head them off some way. This certainly don't hold good every place. As long as we have gone as far as we have and you have consented to be my wife, I am going to carry out the marriage if you will stay by me." And she says that it was solely upon his suggestion and importunity that they left Aurora to be married. She testifies that, upon their return to her mother's home the evening of their wedding day, plaintiff, after dinner, proposed to go to his daughter's, where he had been living, to do his evening chores, and that she then asked him if he did not think it would be better for him to remain at his daughter's home that night, because she thought it would be advisable first to know the nature of the proceedings that had been instituted against him before living with him as his wife, and also because their new home would be ready in a few days. Shortly thereafter plaintiff insisted that they live together, but she testifies that she thought it only decent, proper and modest to remain in her mother's home until the suit against him was dismissed. She says plaintiff told her that the children were about to settle the guardianship proceedings with him, but that he was first compelled to have his property placed so that he could not get hold of it. She testifies, in substance, that she overexerted herself in preparing the new home for their occupancy and in putting down carpets and the like, and that in the evening of their first day in their home he demanded that she then consummate the marriage, and that she declined to do so because of her overwrought condition and because she was ill. She says that to this he took serious exceptions, and told her, in substance, that, if she then refused his demands, he would begin legal proceedings to effect a separation, and just before leaving the house he told her that, if she ever wanted to see him again, she would have to send for him. Mrs. Newman denies that she ever talked with plaintiff on the subject of marriage, and testifies that she knew nothing of his marital intentions until a short time after

he executed the deed of the property to her daughter, and says that for many reasons she always opposed the marriage. She denies with some show of indignation that she ever commended her daughter to plaintiff as a suitable person for his attention, and says that she never spoke approvingly of her daughter to him until after the marriage when she told him that Anna was a good cook and a good housekeeper.

The parties to this action and their families are not strangers to each other nor to the locality in which the suit is brought, both families having lived in Hamilton county more than 25 years. It is in evidence plaintiff and defendant have been acquainted about five years, and during that period both lived in Aurora. The children of plaintiff, and other relatives, and several disinterested witnesses who had known him for many years testified with regard to his mental capacity to transact business on and for some time prior to the date of the marriage. On the part of plaintiff, the testimony that was intended to establish this feature of the case is far from satisfying, while, on the part of defendant, the fact is fairly brought out by his banker and other witnesses who had no interest in the result of the suit, and who had known him for a long time, that he did not appear to be disqualified in this respect. It is, however, fairly established that both his hearing and eyesight were considerably impaired. The direct examination of plaintiff covered a wide field, and in the cross-examination no details seem to have been omitted by defendant's counsel. The ordeal seems to have been severe, but he sustained himself well throughout. His testimony fails to sustain the allegations of the petition or the argument of his counsel with respect to the decrepitude and senile decay of their client.

Section 2, ch. 25, Comp. St. 1909, is as follows: "In case of a marriage solemnized when either of the parties are under the age of legal consent, if they shall separate during such nonage, and not cohabit together afterwards,

or in case the consent of one of the parties was obtained by force or fraud, and there shall have been no subsequent voluntary cohabitation of the parties, the marriage shall be deemed voidable." Disparity in the age of the contracting parties is not given as one of the statutory causes for the annulment of the marriage. It may be that the mating of the pair in question is not such as would have been made by the court if the responsibility of making the selection devolved upon that tribunal, but we do not believe courts of equity are clothed with power to annul a marriage merely because of a marked difference in age. In the marriage relation there is no inequality that is so embarrassing in the unfortunate situations it entails as disparity of disposition and temperament. The marriage in question may have been unwise, and to the court may have appeared foolish, but the record discloses an entire absence of proof of force or fraud exercised by the defendant, or by any person in her behalf, to induce plaintiff to marry her. Plaintiff's counsel argue that defendant is impotent, and thus perpetrated a fraud upon their client; but Dr. Steenburg overcomes this argument when he testifies that she is competent to perform the duties of a wife.

The record discloses the children and relatives of plaintiff maintain he is an incompetent person, and it shows they began proceedings to have him legally declared incompetent and to have a son-in-law of plaintiff appointed his guardian. It is also shown that while the guardianship proceedings were yet pending in the county court his children accepted a deed from him, with a life estate reserved, conveying to them jointly all of the real estate that he owned. They then procured his signature to an instrument empowering a son-in-law to take charge of all of the remainder of his property, collect the rents and the like. With this accomplished, the dismissal of the guardianship proceeding by the children promptly followed, thus suggesting the thought that the charge preferred by them against their aged parent was used

perhaps as a convenience for the attainment of a questionable end.

There is not a trace of testimony to show the defendant at any time was guilty of an immodest act. No fraud appears from the record to have been perpetrated by her. She does not seem to have coerced the plaintiff. The advances and overtures seem to have proceeded from her admiring suitor. With commendable frankness he testifies that in June, when the courtship began, he called at defendant's home, and after a prolonged visit she, at his request, plucked a flower for him from a vase, and when she stepped toward him with it he encircled her waist with his right arm, and said: "Anna, you are the flower I want." The record seems thus fairly to reflect the aggressive determination of plaintiff to win the affection of defendant that is disclosed in the tender sentiment to which he says he gave expression.

Some text-writers and adjudicated cases have been cited by plaintiff, but they seem to us to be inapplicable to the present case, because the citations are for the most part with respect to marriages in which the element of either fraud or force prominently appears, both of which seem to be lacking in the case before us. It is elementary that fraud is never presumed, but must be clearly proved by the party asserting it. We have examined the record carefully, and conclude plaintiff's action cannot be sustained.

The judgment of the learned trial court must therefore be, and it hereby is, reversed and the cause remanded.

REVERSED.